**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 24, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ANTHONY CLARENCE DESMET,

    Plaintiff - Appellant,

v.

SCOTTSDALE INSURANCE
COMPANY,

    Defendant - Appellee.

No. 21-6143
(D.C. No. 5:20-CV-00330-J)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

Anthony DeSmet appeals from the summary judgment granted to Scottsdale

Insurance Company on his claim alleging that Scottsdale had acted in bad faith in

refusing to fulfill its responsibilities under the excess uninsured-motorist coverage in

its umbrella policy. Scottsdale invoked a provision in its policy that excused it from

liability until DeSmet exhausted his uninsured-motorist coverage under his primary

motor-vehicle liability policies. The United States District Court for the Western

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

District of Oklahoma held that the exhaustion provision in Scottsdale's policy was valid and enforceable and that even if it was not, Scottsdale's reliance on the provision was not in bad faith. Exercising jurisdiction under 28 U.S.C. § 1291, we agree and affirm.

## I.    BACKGROUND

On March 5, 2018, DeSmet suffered severe bodily injuries when his vehicle was rear-ended by a vehicle driven by William Akehurst. Akehurst's only automobile-liability coverage was a policy issued by State Farm Mutual Automobile Insurance Company, which promptly paid its $50,000 policy limit. This was insufficient to fully cover DeSmet's damages.

Under Oklahoma law, uninsured-motorist policies provide protection not only when the insured is injured by a tortfeasor-driver who has no liability insurance but also when the tortfeasor has such insurance but the coverage is less than the tortfeasor's liability. *See* Okla. Stat. tit. 36, § 3636(C); *Burch v. Allstate Ins. Co.*, 977 P.2d 1057, 1064 (Okla. 1998) ("If the liability limits of a motor vehicle are less than the amount of the injured insured's claim, that vehicle is classified as *uninsured*."). Such tortfeasor-drivers are commonly referred to as underinsured motorists.

At the time of the accident, DeSmet had three separate motor-vehicle liability policies covering several motor vehicles. Each policy provided $500,000 in uninsured/underinsured-motorist coverage.

In addition, DeSmet had an umbrella policy with Scottsdale. An umbrella policy is a type of "excess insurance policy," which is a policy that "by its terms

2

provides coverage that is secondary to the primary coverage; there is usually no obligation to the insured until after the primary coverage limits have been exhausted." *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001); *see Equity Mut. Ins. Co. v. Spring Valley Wholesale Nursery, Inc.*, 747 P.2d 947, 954 (Okla. 1987) ("*Excess coverage* or *secondary coverage* is provided when, under the terms of the policy, the insurer is liable for a loss only after any primary coverage—*other insurance*—has been exhausted."); Robert E. Keeton, Alan I. Widiss, & James M. Fischer, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* 220 n.524 (2d ed. 2017) ("[E]xcess insurance" is insurance that "overlies underlying coverage and provides additional indemnity for the underlying coverage."). "Umbrella coverage . . . is distinguished from true excess coverage by its 'umbrella,' which extends to additional risks not within the underlying coverage and brings those additional risks into coverage." Keeton, Widiss, & Fischer, *supra*, at 220 n.524. A core feature of umbrella (and true excess) policies is that they "require the existence of a primary policy as a condition of coverage." 15A Steven Plitt et al., *Couch on Insurance* § 220:32 (3d ed. June 2022 update)*.* Excess and umbrella policies must be distinguished from "[e]xcess 'other insurance' clauses" in primary liability policies, which are "devices whereby a primary insurer attempts to limit or eliminate its liability where another primary policy covers the risk." *Id.*

The Scottsdale policy provided $2 million in excess liability coverage to supplement coverage provided in DeSmet's automobile-liability and home-owner's

3

policies (including liability not covered by automobile-liability or home-owner's policies, with limited exceptions for such things as liability for sexual abuse) and provided $1 million in excess uninsured/underinsured-motorist coverage. An endorsement in the policy stated:

> It is expressly agreed that liability shall attach to [Scottsdale] only after the insurers of the "underlying insurance" have paid or have been held liable to pay (whether collectible or not) the full amount of their respective uninsured motorists and/or underinsured motorists liability[.]

Aplt. App., Vol. 1 at 213. The term *underlying insurance* referred to existing motor-vehicle liability policies carried by DeSmet that were listed in the Scottsdale policy's Declarations. As typical of an umbrella policy, maintenance of the underlying, primary insurance was a precondition for coverage; if that insurance was not maintained, the Scottsdale policy would, roughly speaking, be applied as if such coverage were still in force.

DeSmet has not challenged Scottsdale's interpretation of this language as providing that coverage would be triggered only when the total liability of the tortfeasor-driver exceeded the combined liability limits of the underlying uninsured/underinsured-motorist policies (plus the tortfeasor's own liability coverage). As the district court put it, "[T]he Umbrella Policy was not triggered until all underlying insurance policies had paid or been held liable to pay the full amount of their respective [uninsured-motorist] coverages." Aplt. App., Vol. 6 at 1052.

On August 1, 2019, having grown unhappy with the handling of his claim by one of his motor-vehicle liability insurers, DeSmet requested that Scottsdale "step

4

down" and pay the claim itself. Aplt. App., Vol. 1 at 279. Scottsdale responded through counsel on August 21, 2019, informing DeSmet that per the terms of the policy, Scottsdale would pay only after the underlying insurance limits were exhausted. DeSmet filed a petition in Oklahoma state court on March 3, 2020, alleging that Scottsdale's conduct surrounding its refusal to pay amounted to a breach of its implied duty of good faith and fair dealing. The petition did not bring a contractual claim under the Scottsdale policy. On the contrary, the petition included the following statement: "Plaintiff is not bringing an independent or separate cause of action for breach of contract, only the tort cause of action [for the breach of the implied duty of good faith and fair dealing]." Aplt. App., Vol. 1 at 18. At the time the petition was filed, DeSmet had received no payment on the uninsured/underinsured-motorist provisions of any of its three automobile-liability policies.[1]

Scottsdale removed the case to federal court and moved for summary judgment, arguing that the bad-faith claim failed because the excess-coverage provisions were valid and enforceable, and that even if they were not, it had acted reasonably in relying on those provisions. DeSmet countered that the excess provision was unenforceable under Oklahoma's uninsured-motorist statute, but he

---

[1] DeSmet ultimately received payment from all three insurers with whom he held primary motor-vehicle coverage: (1) one tendered its $500,000 limit on March 9, 2020; (2) a second tendered its $500,000 limit on March 12, 2020; and (3) after DeSmet obtained a default judgment against the third on March 26, 2020, it ultimately tendered its $500,000 limit on September 28, 2020. DeSmet argues that, for reasons we need not address, the second and third policies did not need to be exhausted before the Scottsdale policy applied. But even if only the first policy was relevant, it had not been exhausted when the petition was filed.

said that the issue was one of first impression and requested the court to certify the question to the Oklahoma Supreme Court.

The district court ruled that Oklahoma caselaw was clear that the requirements of the uninsured-motorist statute did not apply to umbrella policies like the one issued by Scottsdale. It further held that because the underlying claims had not yet been paid at the time of the suit, there was no basis for DeSmet's allegation that Scottsdale had been acting in bad faith and it granted Scottsdale's motion for summary judgment. DeSmet disputes the district court's reasoning and also argues that the court made procedural errors when dismissing his claim. We are not persuaded on any of his issues.

## II.     DISCUSSION

### A.     Bad-Faith Claim

Oklahoma has "adopt[ed] the rule that an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort." *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977). To show bad faith, however, it is not enough that an insurer "resists [or] litigates a claim." *Id.* There must be "a clear showing that the insurer" was acting "unreasonably and in bad faith" by withholding payment. *Id.* at 905. Thus, DeSmet would need to show that Scottsdale had clearly violated its responsibilities under the umbrella policy; this is a standard he is far from meeting.

DeSmet does not argue that Scottsdale violated any terms of its policy; he instead argues that the relevant policy provisions are invalid under Oklahoma law.

6

The State requires that all drivers carry automobile-liability insurance of at least certain minimum levels, *see* Okla. Stat. tit. 47, § 7-601, and these policies must include uninsured-motorist coverage unless the insured rejects that additional coverage in writing, *see* Okla. Stat. tit. 36, § 3636; *Lane v. Progressive N. Ins. Co.*, 494 P.3d 345, 349 (Okla. 2021) ("§ 3636 . . . requires insurers to include uninsured-motorist coverage within or supplemental to all motor-vehicle-liability policies."). DeSmet notes that Oklahoma courts have held that these statutory provisions can override uninsured/underinsured-motorist provisions in automobile-liability policies and argues that § 3636 likewise overrides Scottsdale's excess-coverage provision with regard to its uninsured/underinsured-motorist coverage. We proceed to examine the governing law.

The Oklahoma Supreme Court has held that an insurer that provides uninsured-motorist coverage as required and governed by § 3636 cannot rely on a provision in its policy that permits withholding payment under the coverage until the insured has exhausted all other uninsured/underinsured-motorist coverage. *See Mustain v. U.S. Fid. & Guar. Co.*, 925 P.2d 533, 534 (Okla. 1996). It ruled that "as between the insurer and its insured[, uninsured-motorist] insurance is primary coverage," *id.*, that is, "the insurer is liable without regard to any other insurance coverage available," *Equity Mut. Ins. Co.*, 747 P.2d at 954. In other words, "an uninsured motorist carrier is liable for the entire amount of its insured's loss from the first dollar up to the [uninsured-motorist] policy limits without regard to the presence of any other insurance." *Burch*, 977 P.2d at 1058. The court explained that this

treatment is necessary to secure the legislative purpose of § 3636, which is "to protect insured persons who are injured by uninsured/underinsured motorists." *Mustain*, 925 P.2d at 535. (When there are multiple insurers, the relative amounts ultimately due from each insurer can later be adjusted through litigation among the insurers. *See id.* at 536.)

Unfortunately for DeSmet, § 3636 does not apply to the Scottsdale umbrella policy. The Oklahoma Supreme Court has repeatedly said that umbrella policies are not "motor vehicle liability policies" of the type governed by § 3636. The leading case is *Moser v. Liberty Mutual Insurance Co.*, 731 P.2d 406 (Okla. 1986), where the court answered the certified question (from the United States District Court for the Western District of Oklahoma) "whether the provisions of Oklahoma's uninsured motorist statute [§ 3636] apply to a policy of excess liability coverage, commonly referred to as an umbrella liability policy." *Id.* at 407 (footnote omitted). The court responded that "[t]he uninsured motorist provisions [of § 3636] apply [only] to . . . automobile liability insurance policies . . . *but not to 'umbrella' policies . . . .*" *Id.* at 409 (emphasis added). Any requirements imposed by § 3636 were accordingly "limited in application to policies insuring against primary liability," whereas "excess coverage" in a broader policy was "beyond the contemplation, scope and intent of [§ 3636.]" *Id.* at 410.

The court reasoned that "the intent of the uninsured motorist legislation" was to place an individual injured by an uninsured/underinsured motorist in the same position as "if the negligent motorist had carried liability insurance" meeting the

"minimum standards." *Id.* at 408. That purpose is satisfied without extending its application beyond standard primary automotive liability policies. *See id.* at 408–09. This holding was reaffirmed in *GEICO General Insurance Co. v. Northwest Pacific Indemnity Co.*, 115 P.3d 856, 859 (Okla. 2005) ("[I]n *Moser* we clearly stated there that § 3636 does not apply to excess liability policies."), and *Raymond v. Taylor*, 412 P.3d 1141, 1145 (Okla. 2017) ("This Court has also stated that . . . Section 3636's provisions apply to all primary automotive liability insurance policies, but not to supplemental, excess, or umbrella policies." (citing *Moser*, 731 P.2d at 409, and *GEICO*, 115 P.3d at 859, 860)).

DeSmet does not contest that his policy with Scottsdale was an "umbrella" policy. By its terms, it was plainly not a "polic[y] insuring against primary liability." *Moser*, 731 P.2d at 410. But DeSmet nevertheless argues that *Mustain* requires that, as between him and Scottsdale, the excess uninsured-motorist coverage must be treated as primary. In *Mustain*, however, the court was addressing a situation where the uninsured-motorist coverage in two *primary* automobile-liability policies applied, but one policy included an "other insurance" clause stating it would only pay the "excess" where a claimant was not the vehicle owner. *Mustain*, 925 P.2d at 535. As noted above, excess "other insurance" clauses in otherwise primary coverage are distinct from "true excess coverage" like that in an umbrella policy. *See, e.g.*, Keeton, Widiss, & Fischer, *supra*, at 220 ("Care must be taken to distinguish these true excess insurance policies from insurance that is designed to be excess pursuant to an excess Other Insurance provision."). We do not read *Mustain* as imposing any

9

requirements on umbrella policies, instead only prohibiting primary insurers from escaping from their uninsured-motorist coverage obligations.

Scottsdale was entitled to rely upon the *Moser* line of cases and was not acting in bad faith when it assumed the legitimacy of the uninsured-motorist provisions of its umbrella policy. Additionally, DeSmet conceded that his view of § 3636 was not settled law when he argued below that this case presented "a matter of first impression" and therefore the issue was "well-suited for certification to the Oklahoma Supreme Court." Aplt. App., Vol. 5 at 836. We have held that "[f]or bad faith liability to attach, the law at the time of the alleged bad faith must be settled." *Davis v. Mid-Century Ins. Co.*, 311 F.3d 1250, 1252 (10th Cir. 2002) (applying Oklahoma law). DeSmet has therefore essentially conceded that his bad-faith claim could not be meritorious.

### B.    Procedural Issues

DeSmet also raises two procedural arguments: He claims the district court erred (1) by ruling his own motion for summary judgment moot after granting Scottsdale's motion, and (2) by denying his request for leave to amend his petition to add a breach-of-contract claim. As to the former, DeSmet's opening brief gives no explanation for why the motion should not have been held moot, instead merely restating his theory of the case; his reply brief does not mention the issue at all. True, were this court to reverse, the district court would then need to revive and address DeSmet's own motion for summary judgment; but that motion could have no merit so long as Scottsdale's summary judgment was undisturbed.

The argument that DeSmet should have been allowed to amend his petition likewise fails. In his original petition of March 3, 2020, DeSmet expressly stated that he was "not bringing an independent or separate cause of action for breach of contract." Aplt. App., Vol. 1 at 18. More than 19 months later, however, in his Response to Scottsdale's motion for summary judgment and just one week before the court's entry of judgment, he requested leave to amend the petition and add this very same claim. The district court denied the request, citing a local court rule that does not allow "[a] response to a motion [to] also include a motion or a cross-motion made by the responding party." W.D. Okla. Civ. R. 7.1(c). The district court also determined that even if the request were proper under the rule, DeSmet had failed to provide grounds to permit the amendment. It said that "the minimal reasons set forth in the Response neither indicate that justice requires such amendment nor constitute good cause or a showing of diligence." Aplt. App., Vol. 6 at 1057. DeSmet does not confront these reasons on appeal, instead arguing that leave should have been freely given because no additional discovery was needed and his injuries were severe. We see no abuse of discretion by the district court. *See Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1203 (10th Cir. 2018) ("[T]he decision to grant leave to amend the pleadings is within the discretion of the trial court, and we will not reverse the court's decision absent an abuse of discretion." (internal quotation marks omitted)). As we have stated previously:

> [P]laintiffs cannot wait until the last minute to ascertain and refine the theories on which they intend to build their case. We have repeatedly held that[] untimeliness alone is a sufficient reason to deny leave to amend when

11

the party filing the motion has no adequate explanation for the delay. And, where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial.

*Id.* (brackets, citations, and internal quotation marks omitted).

## III. CONCLUSION

We **AFFIRM** the judgment of the district court.

Entered for the Court

Harris L Hartz
Circuit Judge